Our next case is 23-2229 Balfour Beatty Construction, LLC versus the GSA. Mr. Dupree, you reserve three minutes of time for rebuttal, correct? Correct. All right, you may start whenever you want. Thank you, Judge Rayna, and may it please the Court. Tom Dupree on behalf of Balfour Beatty. The Board committed legal error and misinterpreted our contract when it forced Balfour Beatty to bear the costs of the government's own flawed bridging design, its failure to share its superior knowledge of the true conditions at the project site, and all the resulting delays. Mr. Dupree, you've got a number of issues here. Which do you think is the most important one? And what I'm thinking of is you've got the mat slab issue, the generators issue kind of together, then you've got the contaminated soil, the contaminated water, and certain other different site conditions. Which to you, do you think it's important for you to focus on an argument? Because we obviously can't touch on all of them. Sure, I'd like to focus today, if I could, on the design issue, which encompasses mat slab generators and encompasses many aspects of the flawed design, and also the delay issues. If we have time... It's the 107 days. Well, yes, we have different components of delay. I think it's 171 for the piece that we'll focus on today, which is the pre-excavation delay. But if I could begin with the design claims. And here, the board committed a fundamental legal error when it said that the controlling authority in this case is Mortensen... Excuse me, is Floor rather than Mortensen. In this case, the government chose to use a design build bridging project delivery method. Under the board's decision in Mortensen, and frankly, the United States Supreme Court decision in Spirin, that means that the government warranted its portion of the design. And that's confirmed by the language of the contract. Do they have to specifically warrant it? They don't, Your Honor. In fact, this court in white refers to it as an implied warranty. That, going back to Spirin, when the government gives design specifications, as it's undisputed they did here, that carries with it an implied warranty. We were directed to build to that 30% design. We were inhibited from deviating from it. And we were, in fact, directed to rely on that design in submitting our price proposal. And of course, it turned out that the design, again, undisputed, couldn't be built. It was flawed in many ways. And where the board went awry, Your Honor, is simply excusing the government from the fact that it had warranted its design. So for that reason, Judge Schall, I think that first issue, our design claim, which encompasses, again, multiple aspects of the design, I think should be reversed by this court on the basis that the board simply applied the wrong law. When it said that floor, which is a design build case where the contractor designs it, it said floor was the controlling authority, not Mortenson. Clear and indisputable error. Mr. Breed, one question. What is this, it's mentioned in the brief, so what exactly is this process that's referred to as, and I think it's in the spec too, this process that's referred to as validation? What do we actually, what was that, what was supposed to happen there and what was it supposed to achieve? Sure. Validation occurs after contract award. And that's when the contractor actually, you know, starts kicking the tires and double checks the work that was done. Before work is started. Correct. Yes, before work is started. But the key point, I think the relevant point here, is that validation occurs after the price is locked in, after the project has been awarded, after the bid has been made. That's when validation occurs. So if the contractor discovers an error during the validation process, well that might require, that would require a price adjustment. That's the key point here. What is the contractor supposed to do during the validation process? What is his responsibility? They typically, as I said, kick the tires on the work that's done. That can involve double checking the calculations, making sure that it can actually be built. Again, it's looking over the shoulder of the work that the government did in the original design. The design work. Correct. But again, key point, by the time that validation happens, the price has already been set. And that's the key point here. So the fact that we had an obligation to validate it is irrelevant because, again, it happened afterward. So the board committed a key legal error that we believe requires judgment in our favor on the design claims because Mortenson and Spearman applied to this case. If I could turn to the compensable delay issue, which is the second issue, and here I'd like to focus on the pre-excavation period. That was 171 days of delay, undisputed on this record. This is window one. Your honor is right. Exactly right. Window one. And so here the reason for that delay was twofold. The government did two things that caused the delay. One is it submitted a faulty design. And number two, at the 11th hour, it reassigned responsibility to perform the soil pre-characterization report. We're all ready to roll. The government said, hey guys, guess what? We actually didn't do this. You do it instead. That caused months of delay, which again, I don't think the government is contesting that they are at least partially at fault for all of that. But where the board went awry is it said that we, the contractor, engaged in concurrent delay. And our key point here, your honor, is that if the court agrees with us on the first claim, on the design claim, it follows that we are entitled to recovery for compensable delay. And here's why. The reason the board gave for ostensible concurrent delay was they said, you guys haven't completed the pre-excavation work that you were supposed to based on the plan schedule. But here's the thing. So you got paid for the delay though, right? No, your honor. That's what we're seeking. The government actually did give us more time to complete it, but they didn't compensate us for it. It's kind of a disconnect here. And so what we're asking this court to do is to rule that we are entitled in window one to 171 days of compensable delay. And the key point that I want to emphasize for this court is if the court agrees with us on the design claim, we are entitled to compensable delay, the 171 days, for the following reason. The board's concurrent delay finding is negated if this court agrees with us on the design claim. And the reason for that is that the ostensible reason why the government thought we did a concurrent delay is we didn't complete the pre-excavation work. But the reason we couldn't do the pre-excavation work on the plan schedule was because we were fixing the government's flawed design. We couldn't get a permit that would allow us to- When you say the design claim, what exactly in terms of are you talking about? I'm talking about the mat slab issue, the generators issue, the inadequate subterranean walls, the various aspects in which the government's design was defective. How do we sort that out if we think you only went on some of those and not all of them? We still have to sit it back, but we can't really figure out how much of it is compensable delay or not. Let's just say that all I think that the board messed up on is the mat slab. I think the mat slab is pretty specific about what they warranted it was going to be. There's two numbers that provide some discrepancy, but what it ultimately ended up being was layoffs above those numbers. That seems like a defect to me. That's the only thing I find for you on the design defect. How does that affect your argument on this compensable delay? I think in that universe, Judge Hughes, the right answer would be to order to reverse and render judgment be entered in our favor on the design claim. The amount of damages stemming from that is actually going to be determined at a future date. We have a future date where we're determined the damages on the basis of the claims to which we're entitled. I think logistically, what the court would say is reverse on design, render judgment for Balfour on design, and then to your honor's point, at a future date, they will calculate the precise amount of damages that flow from that claim. Meaning the mat slab thing? Among others, but the other elements of our design claim like the generator. To Judge Hughes' question, exactly. He cabined it to the mat slab. Yes, yes, yes. I take the point, Judge Hughes, but I would say... No, I understand you have arguments for another one. I think the mat slab is a very strong one for you. The other ones, I think, are a little bit harder. I hear what you're saying, your honor. I would simply say that the board's legal error, saying that Mortenson didn't govern, that affected everything, all of it. That was just a fundamental legal error. They analyzed it under the wrong standard. That's why I take your honor's point, but I do think all of them are compressed within it. If I could then move on to the other remaining issues that we have, which are the differing site conditions and superior knowledge claims. That's one thing I was going to ask you, Mr. McQueen. You seem to go... One of the things that struck me in the brief, you seem to go back and forth between superior knowledge and type one differing site condition. Which one is it? Well, Judge Shaw, it's because we went on both, your honor. We put both in the alternative. We submitted both as a basis for decision. We went on both. I'll begin with superior knowledge. I think that... Which do you think is your strongest? I think probably superior knowledge, precisely because we have evidence that the court has seen that they knew the conditions, the true conditions at this site, and they didn't tell us during the procurement process. Are you talking about the water or the soil? I'm talking primarily about three things. The first thing is that they told us that the soil was 5% contaminated when they were sending emails to one another saying, I bet 75% is going to be contaminated. In fact, 80% was contaminated. Number two, the water. The report, the geotechnical report said the water is clean enough to drink. Well, it wasn't clean enough to drink. It was heavily contaminated that we couldn't even discharge it into the municipal sewer system. The third thing was the underground caissons. They said, well, you might find some remnants of pieces and structures. Well, what we actually found, Your Honor, were 19 detailed caissons buried beneath the surface. And then in discovery, we discovered the government had site drawings that showed these specific 19 caissons in a Kroll Crusher pit all buried. You were aware of some of these circumstances, too. You had knowledge of the underground structures, that there were underground structures. Well, Judge, what they said and what we had knowledge of was, in the government's words, there were remnants. And they said, in fact, that they have been, or in large part, had been removed. And I think one- Isn't that enough to compel you to go and do due diligence on those particular circumstances? It's not, Your Honor. And here, I would point out that there are cases. We cite a few in our brief. There's the marine industries. Do you still have the superior knowledge issue working in a situation like I described? You do, Your Honor, because, again, they are in possession of the knowledge. They knew exactly what was buried there. They knew exactly. We didn't. The most that they can say is the argument Your Honor articulated, which is they say, we have generalized exculpatory language and disclaimers that should have put you on notice, that maybe we don't know exactly what's buried. This court and the court of claims have said that is not enough to defeat a superior knowledge claim. This sort of generalized exculpatory language, these sorts of broad disclaimers, is insufficient as a matter of law to defeat a superior knowledge claim or a differing site conditions claim, for that matter. We got absolutely none of that. What they told us was wrong. And then we later found out they had known it all along. So for those reasons, Your Honor, we believe that we prevail on those claims, regardless of whether the court analyzes it as superior knowledge or as differing site conditions. The final point I'd like to make before I sit down is if the court rules in our favor on those differing site conditions superior knowledge claims, each one of those claims also brings with it some days of compensable delay. We set that forth in footnote two of our opening brief, again in footnote one of our reply brief, where we identify the precise So I just ask the court not lose sight of that if it were to rule in our favor on any of the differing site condition or superior knowledge claims. And with that, I'll reserve. Thank you. Thank you, Counselor. Counselor Berg. Good morning, Your Honor, and may it please the court. Beginning with the issue of compensable delay in window number one. Of course, as the court is aware, this is a substantial evidence question. There is substantial evidence in the record for the board's rejection of Balfour's claim for pre-excavation delay, even when the soil pre-characterization requirement had shifted to the contractor. For example, at appendix 4793, there's this construction schedule there that shows, as the board found at appendix 78, that Balfour's concurrent delays of numerous activities delays that of excavation at the site. So it was not the soil pre-characterization change that caused the concurrency of delay, nor was it as Balfour admitted before the board of appendix 17408 to 409, the excavation and settlement permit. As supported by substantial evidence, the court should affirm. The pre-characterization, what exactly is that? I mean, it was something that originally the GSA was going to do, then it handed it off to the contractor. But what is involved? Is this a further check to do further checks of the soil? Yes, Your Honor. My understanding, and again, I'm not a structural engineer or a geotechnical engineer, but my understanding is that this was a soil characterization study that Balfour, originally GSA was under contract as the party to do, that then was shifted to Balfour and was compensated to do this task. They produced a report about the quality of various soils at the site to characterize that soil for disposition down the road. Okay, and this is done after contract award This was done after contract award, yes. And to be clear, it would have been done by GSA as well, potentially after contract award, because there was no timeline on doing it before contract award. Again, as supported by substantial evidence, the court should affirm the delay, the rejection of Balfour's claim for pre-excavation delay. Turning to the legal errors claimed in the bridging documents, I understood Judge Hughes to be perhaps inclined to rule that the mat slab thickness was warranted in the bridging documents at issue. However, the court should affirm the Board's finding that the, rather than denoting or representing a design specification with regard to the mat slab thickness, the bridging documents themselves, and this is at Appendix 83, the Board properly found, raised a question that Balfour should have inquired of the contracting officer. If it was a question of, I think, if I get the numbers wrong, you can correct me, but one thing said 16 and one thing said 24, right? Something like that. Those numbers, Your Honor, came in validation after award. Okay, but it ended up being almost twice that. So even if the range was, even if there's a range, aren't they entitled to rely on that range and not expect it to be almost twice that range? No, Your Honor, because there was no range in the bridging documents itself. Balfour, during validation, as Judge Shaw mentioned before, was discussing with opposing counsel, validation is an important part of this project. After award, the contractor... What did the designer say about the slabs? At Appendix 3801, there's a drawing, SB 101, that rather than having a specific number of inches that the slab was to be, simply says, quote, match adjacent existing building foundations. That is the entirety of the specification in SB 101. Then there's a report in the bridging documents as well that, as the board found at Appendix 83, would have reasonably caused the contractor to understand that there is a difference between the slabs needed because the bearing pressure on the slabs for the building that Balfour was going to build versus the one that was directly next to it was going to be different, and that's at Appendix 1737. The board properly found, based on those two obvious discrepancies, that Balfour should have inquired of the contracting officer. In reply before this court, Balfour does claim that the order of precedence clause resolved that inconsistency. That argument should be forfeited because it was not made in the opening brief, and in any event, additionally, a basis for affirmance on this ground is that the specification in drawing SB 101 at Appendix 3801 is actually a performance specification. It does not specify the manner of performance. It specifies an objective that the contractor was to, quote, match adjacent existing building foundations. That's all that it says. Mr. Byrne, I had one question. This is more in the nature of a housekeeping inquiry, I guess, and Mr. Dupree would also speak to this. We have confidential markings on the appendices, and it appears, unless I'm wrong, that some of the specification is confidential. Is this still something? In terms of any discussion or any opinion, what does this mean? Can we ignore this confidentiality now, or is it still something we have to be concerned about? Insofar as the parties have quoted the specification in the briefs, Your Honor, those have been in the public record, and therefore there is no need for the court to shield those quotes. But what if we look at something that's, if the court looks at something that's not in the briefs? We would request for us to be able to consider compliance with the board's protective order that we're perhaps given notice of that potentiality and ability to comment. Are parts of the specification confidential? They are. Why is that? My understanding, Your Honor, is that the project does include sensitive aspects of a national security organization. Is this going to be for homeland security or something? Well, let's leave discussion now of the highlighted information in the protective order that we have. I'm looking at it. It's in the blue brief, and let's stick to what we know to be public, what's in the public briefs right now, okay? Correct. So if it's in the brief, it's fine? If it's in the brief, it's fine for public comment and publishing, Your Honor. The generator exhaust requirements, Your Honor, is the other bridging document error alleged and focused on in this case. That, however, is a performance specification. Again, as the board correctly found that Appendix 83 to 84, as Balfour had all along, for example, at Appendix 3921 and 2741, the requirement to comply with these environmental exhaust requirements on generators always was in the bridging documents and was a performance objective as opposed to a design specification. And, Your Honor, just to take a step back on where we are in this with these bridging documents. Could you address real quickly Balfour's argument about the legal layer on floor? Your Honor, the floor, as an initial matter, floor is a CBCA, a Civilian Board of Contract Appeals precedent that is binding on the Civilian Board of Contract Appeals. Mortensen, M.A. Mortensen, is an ASBCA precedent that is not binding on the CBCA as a matter of law. In this case, it was correct for the board nonetheless to find that floor controlled analysis with regard to the mat slab thickness and the generator exhaust requirements because neither of those are design specifications. Neither of those are the government saying you are definitely going to be able to build the project based on these objectives or these specifications. That is not what we have in the bridging documents. I gather you don't agree with Balfour's assessment of floor. We don't agree that floor, that it was incorrect for the board to find floor control. What's wrong with what, what's wrong with their arguments that they made a few minutes ago? The principal concern, Your Honor, as we specified in our brief at 31 to 32, for example, is that this is a preliminary, conceptual, incomplete, not fully coordinated design that Balfour, as Judge Schall recognized, was to then validate during performance. In M.A. Mortensen, which is the board decision, the ASBCA decision that Balfour wants this court to find controls in this case with the entirety of the bridging documents, that 35 percent design was stipulated as being complete. There is no stipulation in the bridging documents at any level of completeness. There is a 30 percent conceptual design that multiple places in the bridging documents, for example, at 1339 at the appendix and 2736 of the appendix. What's the first side of the appendix? 1339, Your Honor. Additionally, at appendix 2736, focusing on 27, I can go in order. I can quote for the court what these documents say. 1339, the bridging documents are not intended, nor are they accurate for actual construction. Rather, they are intended to convey the conceptual design and historic preservation approach of the building, as well as the project-specific design criteria and requirements. 2736 echoes this and says, bridging documents are, quote, not fully coordinated, but rather conceptual in nature and are intended to depict the overall intent of the project in terms of general design concept, the main architectural elements, and describe the performance of the other systems. But if they had specific requirements in them, aren't they designed from the government that the government is warning? If they had specific requirements in them, yes, Your Honor. We're citing a lot of preparatory language, but there's a lot of specifics in these documents too, and that's kind of what we have to determine. The court only needs to determine whether these specific requirements at issue in this case were design or performance. The point with regard to the preparatory language is that Balfour is already in some sense behind the eight ball in being able to convince the court that there is a design specification in these documents, given the preliminary, not fully coordinated, conceptual nature of them, where there's no stipulation of completeness. But they were free to throw this out, right? That's correct. They had to follow the design that was set forth in these documents. They were able to change the design so long as it was not changing it from being to something substantially different from the concept, and that's at Appendix 2743, that substantially different standard. So they did have substantial leeway to change and build off of the documents that the agency gave them as a head start. Again, in the validation process at Appendix 2736, the contractor was to be responsible for, let me just quote, the contractor had, quote, to draw, redraw, and complete designs to create a, quote, fully coordinated design of the work included in the bridging documents at no additional cost to the government. The contractor had to draw... So the government said, here's what our basic design requirements are for this project. Concept. It's a little bit more specific than just go build a building. There's some really specific things in here, and they say, give us your price for this following the things we have in here, but you have to validate it, and if it changes, you can't change your price, even if it's substantially different. If it's substantially different, you need to get permission from the government to change the design, and then, of course, that does come into potentially more compensation. As the board found, for example, your honor, at Appendix 100, the board did recognize that with regard to fuel storage tanks, for example, there was a warranty, and there did apply the M.A. Mortensen standard of the contract. This was a substantial change to what was conceptualized. So you agree that if there is a design that is specific enough to contain a warranty, that Mortensen applies? Correct. So you find the slab stuff is a design that has a warranty that you lose on that one, right? I mean, I know you don't think it is, and I understand your arguments, but if we say that there's enough in this document that the government warranted this slab would be of a certain thickness, and it turned out it was significantly more, that would be compensable in some way. If, as a matter of law, the court finds the language at Appendix 3801 to be a design specification that, again, only stated match adjacent existing building foundations, then yes, if Balfour is able to overcome all of the other language in this solicitation, the bridging documents that are conceptual, preliminary, incomplete, then they may be entitled to compensation for that. But the court should affirm the board's sound conclusion that there was a question in the documents as regard to the mat slab thickness. Balfour failed to inquire. Balfour forfeits its appeal about the order of precedence clause, and in any event, that's a performance specification that carries no design warranty. On the underground obstructions point, and I realize I have 45 seconds. Let me ask you a quick question here. It seems that the board determined that the bridging documents were performance, and, you know, based on that, it automatically allocates risk to the contractor. Am I correct on that? No, your honor. I don't believe the board found, as we demonstrated in our brief, the board did not make an overarching finding as to whether the bridging documents were either performance or design specifications, but rather the board considered, for example... Well, it determined that the bridging documents were to be performance and not design, and that because of that, its specifications allocated the risk to the contractor. I have that at JA83. But anyway, my point is, it seems to me that it's on that basis that the board goes on and makes its decision on Mortison. Your honor, to be clear, at appendix 82, the board has the overarching consideration of to what extent a 30% design was design or performance, and it talks before that about the fact that you can have both design and performance specifications in the same solicitation. It then goes on to distinguish floor from Mortison on appendix 83 with regard particularly to the mat slab thickness and the generator exhaust requirements. Those are two issues that were before the board preserved for the board's decision below. What happens if we rule against you with respect to allocation of the risk to the contractor? That initial assessment that the board makes, does that affect the entirety of the case? If the court finds... I guess I'm understanding your honor's question because the board did not find overarchingly whether the bridging documents were design or performance specifications, but rather the board did take it piece by piece and conclude based on each alleged design or bridging document error, whether that included or encompassed a performance or design specification. Appendix 83 is the example with regard to... Some of them were design, some of them... Well, the board found some were design, some were performance. You agree with the board's allocation. Your friend on the other side is arguing for a different allocation of design versus performance and he thinks more of them are design. That would be an accurate summary. Yes, your honor. If I may, I realize I'm into my... You're out of time. Yes. Go ahead. Well, I was just going to comment briefly on the underground obstructions issue with regard to superior knowledge and site conditions. Our brief demonstrates that Balfour's claims in this regard are wholly at odds with the specific warnings at issue in the bridging documents as to what was going to be uncovered when excavation of the site began. For example, on the contaminated soil piece at 44 to 46 of our response brief, we demonstrate there that there is no superior knowledge with regard to that given, for example, that at Appendix 2065, there's expressed references to there being coal fragments and ash in this sediment or this soil that was going to be excavated. Similarly, with regard to contaminated groundwater, there are multiple equivocations in the solicitation. For example, the specifications or the geotechnical report, sorry, at Appendix 2070 was equivocal as to the water quality. Additionally, moving on to the Bell-Cassins, which I also recognize... Wrap it up. Yes. Your honor, just to put a point on what we're talking about with the specificity of these warnings in the Yes. And with that, at Appendix 2065, I was going to point the court out to the Bell-Cassin warning being there. And for these reasons, we respect the request that the court affirm the decision of the board. Thank you. Thank you. Counselor Dupree, you have a little over two minutes. Just a few points, your honor. First, on the question of the design issues, Judge Hughes, you're absolutely correct in saying that general precatory language cannot overcome specifics. And in that regard... So what's your response to him on the slab that the best part, the document just says match the existing? Well, it's a design specification. I mean, frankly, to be totally honest... I mean, it sounds like a design specification. I cannot imagine how you could argue anything different, to be honest. Was there any reference to what the existing was in these documents? Yeah. Well, it said match the existing. And then you look at the existing and it says 18. So it's a design specification, as is the other issue, the generators design issue. But it turned out to be 43. So, well, right. But the design specification there was the height. They couldn't fit. I mean, so again, height of ceiling, thickness of mat slab are textbook examples of design specifications. The generators are a different issue, isn't it? Because you were aware of the two different types of generators and one may have to fit and one wouldn't. Well, the issue there, your honor, is that the specified equipment did not fit in the specified dimensions. So again, we were given design specifications, the height of the rooms. That doesn't work. Again, design specification, not performance. So everything we've been talking about... Didn't the documents also specify the larger generator in the event that the smaller one didn't work? Yeah, the document specified the various types of generators. And our point is simply that what we were directed to provide did not fit in the space that we were to build. That's why it's a design specification. The other point I would make in regard to Judge Hughes' question is in the White case, it's 296 F3rd at 1084. That's where this court specifically says when the government provides a contractor with design specifications, the contractor is bound to build according to the specifications. That's this case. The contract carries an implied warranty. Full stop. That's this case. I would also point out that we had to bid. We had to formulate our price proposal based on that design. So that too cuts in our favor. I also want to point out with regard to remanding hopefully for more than just the mat slab, the board actually failed to address several of our design defect claims. The inadequate ventilation and the subterranean walls not being sufficiently thick. The board simply overlooked those claims. So that would be another reason if this court were to remand to enable the board to consider those claims that it failed to do the first time. On the delay point, let me quickly point out page 78 of the board's decision, the joint appendix. This is where the board recognizes the point I made in my opening, which is to say the board recognizes that our pre-excavation site work could not begin until we had the permit in hand. That is a key point because what it means is, well, if we didn't have the permit in hand, why? It's because of the design issues. So that's why if this court agrees with us on design, it automatically follows as the night the day that we get the compensable days of delay. The final point on the differing site conditions is simply to direct the court. Can I just ask you on that last point? I know you're over time. Do we have to decide that or can we let the board decide that? Well, look, candidly, it's within this court's discretion. I know, but we don't have to wait. Well, look, I would like to decide as little as I need to. I understand the instinct, but all I would say is I think this court could comfortably rule as a matter of law if we went on design, it negates the board's justification. So I would say maybe the court could say it negates the justification of concurrent delay and let the board figure out what the consequence of that is. But I think that's the key point, that it negates the concurrent delay. That sounds like a good place to end too. Thank you, Judge. Appreciate it.